THOMAS B. COLUMBIA, Respondent, *v.* GEORGE C. LEE and Others, as Copartners Doing Business as LEE, HIGGINSON & CO., Appellants.

Second Department, February 8, 1935.

*Henry A. Uterhart* [*John R. Bartels* with him on the brief], for the appellants.

*Charles H. Bailey* [*James S. Darcy* with him on the brief], for the respondent.

CARSWELL, J. Plaintiff had a safekeeping account with the defendants, who are stockbrokers. He has recovered a judgment of $63,524.58 against them on the theory that, during a specified period, without authority they transferred free, to his damage, from his account, certain securities. These free transfers have been deemed acts of conversion. The term " free transfer " connotes the transfer by a stockbroker of a security from a customer's account without consideration or the giving of a credit for its value.

Before this action for an accounting was brought, defendants gave plaintiff, in response to his demand, a statement of account which disclosed a balance of $211.95 and three sets of securities of little value. These securities and balance were tendered and plaintiff refused to accept them. After this action was begun and issue joined, the parties consented to a reference to hear and determine. It has been found, after a thirteen-day trial, that defendants converted certain securities by transfers free without authority from the plaintiff, resulting in damage to the extent reflected in the judgment.

The defendants assert that the referee disregarded documentary evidence and certain oral testimony, some of it from the plaintiff himself, which established that one Welton was the agent of the plaintiff; that the transfers made by the defendants were authorized by that agent and that the transfers thus made to other stock brokerage firms were to accounts therein in the name of the plaintiff.

To determine the validity of this contention it is necessary to consider the transactions between the parties as they occurred in three successive periods of time.

The referee seems to have concluded that Welton could not have a dual capacity or relationship to the plaintiff and to the defendants.

Whether he did have such a dual character is the real question in this case.

Welton was plaintiff's son-in-law. He entered the employ of the defendants in 1919 as a salesman or customers' man. On September 27, 1923, the plaintiff through Welton opened an account with the defendants. It was a safekeeping and not a speculative account. The securities in it were paid for in full at or shortly after the time of purchase. The purchases were made through defendants on orders filed by Welton.

The confirmations of these transactions in the beginning went to the plaintiff in person. Later they were sent to the plaintiff in care of Welton. On the latter occasions, statements were sent to the plaintiff which reflected these transactions covered by the confirmation sent to the plaintiff in care of Welton. The plaintiff, with his own checks, paid the sums required by these statements.

Welton left the employ of the defendants on October 31, 1925. The transactions which occurred during the period while Welton was an employee of the defendants are not attacked. Before the close of this first period, the practice of having confirmations of transactions go to the plaintiff in care of Welton had begun, as well as the payment by plaintiff of amounts due on statements reflecting those transactions. After Welton left the defendants' employ the account was continued and transactions were conducted in the same manner as in the latter part of this first period.

During the period following October 31, 1925, an added form of activity occurred. Certain securities were transferred by the defendants, on orders from Welton, from the plaintiff's account to an account *in the name of the plaintiff* in the firm of Howe, Snow & Bertles and later to a successor of that firm, Howe, Snow & Co., and still later to Willard & Co. When they were so utilized, Welton was connected with these concerns. Some of these securities were retransferred for purposes of sale and the proceeds were transferred back.

Plaintiff challenged the validity of each transfer free by the defendants subsequent to October 31, 1925, when Welton left the defendants' employ, up to November 4, 1931. The death of Welton on October 23, 1931, while connected with Willard & Co., precipitated this claim. On the trial defendants produced an instrument executed by plaintiff on May 23, 1930, which constituted Welton plaintiff's attorney in fact for all purposes connected with the account. At first plaintiff questioned its genuineness but finally conceded its validity. This eliminated all transactions occurring after May 23, 1930, and limited the period of grievance to that between October 31, 1925 (when Welton left defendants' employ),

and May 23, 1930. For transactions during this period plaintiff has judgment on the theory that defendants, without any authorization or justification, honored Welton's directions to make the transfers.

What was the effect on plaintiff of transactions executed prior to May 23, 1930, by defendants on Welton's directions? Indisputably, prior to May 23, 1930, plaintiff gave no written authorization to the defendants to honor Welton's directions. During the first period when Welton was an employee of defendants, particularly during the latter part of it, plaintiff gave personal checks in settlement of statements sent to him which reflected transactions executed on Welton's directions to defendants. To this extent plaintiff ratified anything that Welton did in his name through the account with defendants. Those transactions presumably were beneficial, as no complaint is made with reference to them. Their manner of execution is a factor in determining the legal effect of plaintiff's actions in respect of them. If they were originally unauthorized by plaintiff, Welton's unauthorized acts, thus acquiesced in and acted upon by plaintiff, resulted in Welton's being plaintiff's agent by ratification as to operations in the account in the purchase and sale of securities in plaintiff's name. During this period, however, there were no transfers free from the plaintiff's account.

During the second period, when Welton was no longer an employee of the defendants (from October 31, 1925, to May 23, 1930), the same methods prevailed in operations in the account in plaintiff's name on defendants' books as had prevailed prior to Welton's leaving defendants' employ.

There was, however, an additional set of practices. Welton had opened an account with Howe, Snow & Bertles in plaintiff's name, and the defendants had transferred free to that account *in plaintiff's name* various securities. There is no direct evidence that plaintiff authorized Welton so to do. These were acts of conversion unless there be evidence establishing agency by acquiescence or ratification. There is such evidence and its form precludes disregarding it.

(a) Plaintiff says he knew nothing about these accounts in Howe, Snow & Bertles and the two other concerns, yet on November 23, 1926, defendants notified him in writing at his Port Washington home of deliveries of securities from his account to Howe, Snow & Bertles and from Howe, Snow & Bertles to his account with the defendants. He was likewise notified by defendants about that time in reference to transactions involving International Match Corporation stock. Compliance with requests relating thereto was had from plaintiff, and, on November 26, 1926, a power of

attorney in respect to that stock was executed and sent to the defendants, through Welton, at a time when a request was made by Welton that all further communications for plaintiff should be sent to Welton in care of Howe, Snow & Bertles, instead of to the plaintiff at his home at Port Washington.

(b) Plaintiff, during this period, received and cashed checks from Howe, Snow & Bertles based on securities that had been transferred free by defendants to plaintiff's account with that firm. Those checks carried conspicuously upon them in large type the name of the Howe firm. The records of plaintiff's account with Howe, Snow & Bertles disclosed that the securities transferred by defendants went into that account in plaintiff's name.

(c) Plaintiff in his income tax returns reported the items based on the securities transferred free into the plaintiff's name in the other brokerage concerns. The data upon which the income tax returns for 1924 to 1930, signed by the plaintiff, were based came from the office of Howe, Snow & Bertles and their successors. There were, separately grouped, transactions affecting plaintiff's account in Howe, Snow & Bertles and the other brokerage concerns and those affecting plaintiff's account with defendants.

(d) Plaintiff's bond registers had certain securities struck from them and others added in his own handwriting, representing transfers by Welton in and out of the account. His memorandum book, in his own handwriting, had the interest payments and dividends on the securities as changed between January 5, 1926, and September 1, 1931. The changes in entries were due to information received from Welton, so plaintiff says.

(e) The correspondence between plaintiff and Welton clearly reveals that Welton was acting for the plaintiff. These exhibits indisputably bring home to him knowledge of Welton's acts in reference to those directions upon which defendants acted. It tells how Welton has bought this or that or exchanged it for another security Many of these letters by Welton to plaintiff were on the letterheads of Howe, Snow & Bertles or the successor concerns with which Welton was associated after he left defendants' employ. They refer to cash withdrawals for plaintiff's benefit. This correspondence is in harmony with plaintiff's own testimony in connection with the opening of the account with the defendants: " Our first thought was that Mr. Welton ought to be just the man to take charge of our account. Q. And it was because of your confidence in him that you went to him? A. Perfectly so."

It thus appears that during this second period from October 31, 1925, to May 23, 1930, when transfers free were being made from plaintiff's account with the defendants, plaintiff had full knowledge

of what was being done, which knowledge is reflected in the documentary evidence indicated, reinforced by the correspondence between Welton and the plaintiff during the period and the evidenced frequent personal contacts of Welton with plaintiff during that period. This knowledge of plaintiff, acted upon by him, was never made the subject of disavowal.

Although the evidence would warrant the inference that plaintiff previously authorized Welton and that direct proof thereof is absent only because of Welton's death, recourse to that inference is not necessary to sustain a finding that Welton was the agent of plaintiff in transactions executed in plaintiff's name with the defendants. This agency, in the language of WERNER, J., in *Small* v. *Housman* (*infra*), is established by an " array of facts and their train of legitimate inferences, all bespeaking the agency " of Welton for plaintiff. When agency arises by proof of acquiescence or ratification, it has as complete binding force as agency directly or expressly conferred in advance. (2 Kent Comm. [14th ed.] p. 616; *Gillett* v. *Whiting*, 141 N. Y. 71; *Small* v. *Housman*, 208 id. 115, 123; *Glor* v. *Kelly*, 49 App. Div. 617; *Lowenstein* v. *Lombard, Ayres & Co.*, 164 N. Y. 324, 329.)

During the first period from September 27, 1923, to October 31, 1925, Welton's relationship was of a dual character. As to defendants he was a salesman or customers' man and had a limited agency for them as their representative. This agency did not include the right to do any discretionary acts with relation to the safekeeping account which plaintiff had with defendants or to authorize the transfer free of any securities therein. He was, however, as subsequent acquiescence and ratification evidenced, a general agent or representative of the plaintiff or customer. This dual relationship is not unique or unknown. (*Bosak* v. *Parrish*, 252 N. Y. 212; *Small* v. *Housman*, 208 id. 115, 123.)

When Welton left the employ of defendants on October 31, 1925, his limited agency for defendants as a salesman ended. That severance of employment was known to plaintiff. All the authority then left in Welton was such as was reposed in him by the plaintiff. The ensuing course of conduct in the second period but added to the effect of the prior course of conduct in the first period in establishing Welton as plaintiff's agent.

There were transactions in which certain checks were transmitted by defendants to plaintiff in care of Welton, which he in turn transferred to plaintiff, detaching therefrom certain memoranda. The opportunity to detach these memoranda, if they tended in any way to mislead the plaintiff, arose by reason of plaintiff's acquiescence in or ratification of Welton's acts of agency. The burden of this

conduct, if any (which resulted in no loss, as the checks reached plaintiff), should be borne by plaintiff.

The fact that on May 23, 1930, defendants obtained a power of attorney executed by the plaintiff does not militate against their position that Welton was authorized to act for plaintiff prior to that date. All the prior transfers free had been made by defendants to accounts in the name of plaintiff in the other brokerage concerns. Therefore, the transfers did not place the securities at the individual disposal of Welton. Plaintiff says the power of attorney was obtained because prior to that date defendants had no authority to execute any transactions directed by Welton. Defendants assert that the need for that authorization arose because Welton wished to have securities or proceeds turned over to him individually rather than into an account of the plaintiff with another concern. If recourse thereto be needed, this latter explanation should be credited in view of plaintiff's reluctance to recognize the validity of that very power of attorney and the fact that, prior to that date, no transfers were made out of plaintiff's account with the defendants other than into plaintiff's account with other stock brokerage firms; that is, none were made to Welton individually or for his individual disposal.

Moreover, the forms of conduct generally *after* May 23, 1930 (when the power of attorney was executed), are precisely the same as those which occurred *prior* to that date. This is not without significance in view of plaintiff's original claim that during both periods Welton's acts were unauthorized and his finding it necessary to abandon that claim beyond May 23, 1930, when confronted with the instrument he had executed.

The legal effect of the situation in reference to this instrument of May 23, 1930, is merely that proof of Welton's agency after that date was placed beyond cavil by the procurement of its execution. The fact of agency prior to that date, however, existed; proof of it resting in a form that lent itself to controversy reflected in this record, which proof, however, is ample and sufficient to establish the fact of agency prior to that date.

It was error, therefore, for the referee to disregard this large body of documentary evidence and testimony from the plaintiff himself which established that every transaction during the period in which he makes complaint was authorized by plaintiff, which authorization, even though not directly evidenced prior to the doing of the acts complained of, was evidenced by acquiescence and ratification.

A judgment to the contrary represents injustice and a wrongful capitalization of the death of plaintiff's son-in-law and his unavaila-

bility to establish whether he had been in fact authorized to do that which he did for plaintiff.

The cases upon which plaintiff relies would justify the judgment but for the body of evidence here present of agency by acquiescence and ratification, which is not involved in those cases and distinguish them.

Plaintiff's objections to the account filed should be overruled.

The judgment as entered should be reversed on the law and the facts, with costs, and the objections to the account dismissed, with costs, and judgment entered accordingly.

LAZANSKY, P. J., YOUNG, HAGARTY and TOMPKINS, JJ., concur.

Judgment reversed on the law and the facts, with costs, and the objections to the account dismissed, with costs, and judgment entered accordingly. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made. Settle order on notice.